# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CLOVELLY OIL CO., LLC** | * | **CIVIL ACTION No. 17-14435** |
| | | c/w 18-5488, 18-9385, 18-9391 |
| **VERSUS** | * | |
| | | **JUDGE CARL J. BARBIER** |
| **BTB REFINING, LLC, ET AL.** | * | **("J")** |
| | * | **MAG. JUDGE JANIS VAN MEERVELD (1)** |
| | * | |
| | | Applies To: |
| | | 17-14435, 18-5488, 18-9391 |

## ORDER & REASONS

Before the Court is a **Motion to Dismiss (Rec. Doc. 242)**[1] by BTB Refining, LLC ("BTB"), Global Oil Management Group, Ltd. ("Global Oil"), Global Oil EOR Systems, Ltd. ("Global EOR"), Global Oil Financial Services, LLC ("Global Financial"), and Harry Sargeant, III ("Sargeant").[2] Several opposition briefs were filed (Rec. Docs. 245, 246, 249, 251, 252, 260), and Defendants filed a reply (Rec. Doc. 263). The Court, having considered the parties' arguments, the applicable law, and the relevant record, denies Defendants' motion for the reasons stated below.

## BACKGROUND[3]

On October 15, 2017, an explosion and fire occurred on the West Lake Pontchartrain East Block 41 Oil and Gas Production Facility ("the Platform"),

---

[1] "Rec. Doc." Citations are to the master docket, No. 17-14435, unless otherwise indicated.
[2] This Order will use the term "Corporate Defendants" to refer collectively to BTB, Global Oil, Global EOR, and Global Financial, and "Defendants" to refer collectively to the Corporate Defendants and Sargeant.
[3] The statements in this Background section are largely taken from the allegations in Davin Billiot's complaint (No. 18-9391, Rec. Doc. 1). There are two other complaints at issue: one by Clovelly Oil Co.,

resulting in one death, several injuries, and extensive damage to the Platform. Clovelly Oil Co. LLC ("Clovelly") owned the Platform, which was located in Lake Pontchartrain approximately one and one-quarter miles from the south shore. (Billiot Compl. ¶ 6, No. 18-9391, Rec. Doc. 1). The Platform was not a vessel under maritime law; functionally it was a "fixed" platform. (Rec. Doc. 412 at 6). The Platform processed oil, gas, and produced water from four wells located various distances from the Platform. (Billiot Compl. ¶ 8). A four-inch diameter flowline connected each of the wells to the Platform. (Billiot Compl. ¶ 9). At the time of the explosion, one or more of the Corporate Defendants were in the process of cleaning the interior of one of the flowlines, as further described below.

On or around October 2, 2017, Clovelly entered into an oral agreement with one or more of the Corporate Defendants to remove paraffin wax accumulations from three of the four flowlines. (Billiot Compl. ¶ 12). To perform this work, the Corporate Defendants utilized a steam generating machine known as the Hydra Steam Generator NO. 003/Hydra III ("the Hydra"). (Billiot Compl. ¶¶ 14-15). The Corporate Defendants mobilized a tug boat and spud barge preparatory to the commencement of the paraffin wax cleaning service. (Billiot Compl. ¶ 19). Located on the spud barge were the Hydra, equipment that monitored and controlled the Hydra, tanks, pumps, hoses, and other equipment necessary to clean the flowlines. (Billiot Compl. ¶ 20). To clean a flowline, the tugboat would move the spud barge to a well so the Hydra could be connected to the wellhead. (Billiot Compl. ¶ 23). By combining hydrogen peroxide

---

LLC (Rec. Doc. 199) and another by James Bordelon and Paul Pfister (Rec. Doc. 200). All three complaints are substantively identical except in a few areas, which are described later in this opinion.

and a catalyst, the Hydra generated steam which was injected into the flowline with the intent of melting the wax accumulations. (Billiot Comp. ¶ 17). The flowline was then pressure flushed, forcing the melted wax and water to discharge into a steel tank located on the Platform. (Billiot Compl. ¶ 19). On October 15, the Corporate Defendants successfully cleaned two of the flowlines in this manner and were in the process of cleaning a third when the explosion occurred on the Platform. (Billiot Compl. ¶ 26).

Clovelly filed a complaint in this Court to recover for the damage to its platform and consequential economic losses. Davin Billiot, James Bordelon, and Paul Pfister—three workers who were allegedly injured in the explosion (collectively, "Individual Plaintiffs")—also filed complaints in this Court, which were consolidated with Clovelly's suit.[4] Each of the Plaintiffs sued the four Corporate Defendants, as well as Harry Sargeant, III, who allegedly founded, controls, and dominates the Corporate Defendants. Plaintiffs seek to pierce the Corporate Defendants' veils and hold Sargeant personally liable for the injuries and damages allegedly resulting from the explosion and fire.[5] Defendants filed the instant motion, which seeks to dismiss Plaintiffs' claims against Global EOR, Global Financial, and Sargeant. Defendants concede that Plaintiffs have stated plausible claims against two of the Corporate Defendants, BTB and Global Oil (Rec. Doc. 242 at 7), although they do move to dismiss any claims that attempt to pierce BTB's and Global Oil's corporate veils.

---

[4] Together, Clovelly and the Individual Plaintiffs are referred to as "Plaintiffs."
[5] Plaintiffs sued parties other than the Corporate Defendants and Sargeant. However, those parties are largely irrelevant to this motion.

## LEGAL STANDARD

On a motion to dismiss, "[t]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (citations and quotations omitted). More specifically:

> To avoid dismissal, a plaintiff must plead sufficient facts to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.

*Id.* (citations and quotations omitted). Furthermore, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## DISCUSSION

### A. Plaintiffs' Claims Against Global Financial and Global EOR

Defendants first argue that Plaintiffs fail to plausibly allege any claims against two of the Corporate Defendants, Global Financial and Global EOR. Defendants further argue that if Plaintiffs cannot state a claim directly against Global Financial or Global EOR, then Plaintiffs cannot pierce the veil of these entities to reach the assets of another entity or person. The Court accepts the premise of this argument but finds that Plaintiffs have stated plausible claims for relief against these entities.

As to Global Financial, Plaintiffs allege that Tim Morrison—the person who provided Clovelly with a presentation on the Hydra in September 2017 and who

4

was present (and tragically died) during the flowline cleaning operation—was employed by Global Financial. (*See, e.g.*, Clovelly 2d Am. Compl. ¶¶ 40-41, Rec. Doc. 199). Plaintiffs further allege that Morrison knew of dangers associated with the Hydra prior to the explosion but did not convey those to Clovelly. (*E.g.*, Clovelly 2d Am. Compl. ¶ 93). To the extent Morrison was acting as Global Financial's employee when he made the presentation to Clovelly or during the flowline cleaning operation, Global Financial may be vicariously liable for any misconduct by Morrison.[6]

Regarding Global EOR, Plaintiffs allege the following facts to show that EOR owned the Hydra: Global EOR is identified as the "owner" on a placard affixed to the Hydra; Global EOR applied for a patent related to the Hydra; Global EOR provided technical drawings related to the Hydra for a sales and construction proposal and/or contract with Supreme Electrical Services, Inc. d/b/a Lime Instruments, LLC ("Lime"), which allegedly developed software to control and monitor the steam and pressure generated during the flowline cleaning;[7] Global EOR contracted with another entity to furnish labor, equipment, and materials to manufacture and provide equipment related to the Hydra; and Global EOR had marketing materials for the Hydra that reveal knowledge regarding particular dangers associated with the Hydra that were never disclosed to Clovelly. (*See, e.g.*, Clovelly 2d Am. Compl. ¶¶ 20, 80-85). Furthermore, Plaintiffs allege that the explosion was caused by, inter alia, a failure

---

[6] The Court notes, however, that Plaintiffs' allegations regarding Global Financial only barely "nudged" their claims across the line from possible to plausible. *See Iqbal*, 556 U.S. at 683.

[7] Lime is also named as a defendant in the Plaintiffs' complaints.

to have adequate and proper equipment to clean the flowline. (Clovelly 2d Am. Compl. ¶ 126). Plaintiffs have alleged plausible claims against Global EOR.

In contrast to their arguments regarding BTB and Global Oil, Defendants do not discuss what veil piercing standard applies to Global Financial and Global EOR, much less whether Plaintiffs have plausibly alleged claims that, taken as true, satisfy this standard. Accordingly, Defendants' motion is denied insofar as it targets the claims (veil piercing or otherwise) against Global Financial and Global EOR. Defendants are free to re-raise these issues on summary judgment.

**B.    Clovelly's Claims Against BTB and Global Oil**

Clovelly and Defendants appear to agree that Texas law supplies the veil piercing standard for BTB, while Bermudan law applies to Global Oil's corporate veil. (Rec. Doc. 251 at 11, 22; Rec. Doc. 263 at 4, 7). This is in contrast to the Individual Plaintiffs, who argue that the veil piercing standard under federal common law, which they contend is lighter than Texas's and Bermuda's standards, applies to their claims. (Rec. Doc. 245 at 6-17). The Court is not required to accept Clovelly and Defendants' agreement as to which law governs, as the Court is not bound by the parties' stipulation of law. *See Marden v. Int'l Ass'n of Machinists & Aerospace Workers*, 576 F.2d 576, 580 (5th Cir. 1978); *see also BAC Home Loans Servicing, L.P v. Groves*, 583 F. App'x 414, 416 (5th Cir. 2014) (unpublished). Furthermore, the Court questions whether the laws of Texas and Bermuda control here, as explained below.

6

Defendants present the following choice-of-law analysis (which Clovelly does not contest): Clovelly's complaint invoked diversity jurisdiction; courts in diversity cases apply the choice-of-law rules of the forum state (Louisiana in this instance) to ascertain what law governs the veil piercing analysis; under Louisiana's choice-of-law rules, the state of incorporation governs the analysis; and, consequently, Texas law applies to BTB and Bermudan law applies to Global Oil. While this analysis may be appropriate for a case in which diversity is the only possible basis of federal jurisdiction, the Court doubts that it applies when a ***maritime*** claim is merely brought "on the law side" of the Court under diversity jurisdiction, which appears to be the situation here.

As a general rule, when a plaintiff brings a maritime case in state court or in federal court under diversity jurisdiction, the issues will be resolved by the application of the substantive rules of admiralty and maritime law. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22-23 (2004); *see also* 1 Robert Force & Martin J. Norris, *The Law of Seamen* § 1:10 (5th ed. 2003, rev. 2014); 14A Charles Alan Wright, et al., *Federal Practice & Procedure* §§ 3671.3, 3672 (4th ed. 2018 update). Clovelly's claims sound primarily, if not entirely, in contract. Therefore, if the contract to clean Clovelly's flowlines is maritime, then substantive maritime law will apply.

The Fifth Circuit recently announced a new test for determining whether a contract involving the exploration, drilling, and production of oil and gas is maritime. *See In re Larry Doiron, Inc.*, 879 F.3d 568, 576 (5th Cir. 2018) (en banc). First, is the contract one to provide services to facilitate the drilling or production of oil and gas

on navigable waters? Second, does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract? If the answer to both questions is "yes," then the contract is maritime.

The Fifth Circuit applied this new test in *Crescent Energy Services, L.L.C. v. Carrizo Oil & Gas Inc.*, 896 F.3d 350 (5th Cir. 2018). There, the court held that a contract to plug and abandon three wells accessible from fixed platforms located in Louisiana coastal waters was maritime. *Id.* at 361-62. The court explained that the first part of the *Doiron* test was met because "the wells were located within the territorial inland waters of Louisiana and . . . the vessels involved in this contract were able to navigate to them." *Id.* at 357. The court reached that conclusion even though the underlying event that gave rise to the contractual dispute (personal injury) was confined entirely to a fixed platform. *Id.* at 356-57. The court held that the second part of the *Doiron* test was met because

> this contract anticipated the constant and substantial use of multiple vessels. It was known that the OB 808 [a spud barge] would be necessary as a work platform; that essential equipment would need to remain on that vessel, including a crane; that the most important component of the work, the wireline operation, would be substantially controlled from the barge; and that other incidental uses of the vessel would exist such as for crew quarters.

*Id.* at 361. Notably, the court was not dissuaded from its conclusion by the fact that prior cases had deemed wireline operations—"the most important component of the work" in *Crescent Energy*—to be non-maritime activity, because *Doiron* had jettisoned such considerations from the analysis. *Id.* "What is important," explained the court, "is that use of the wireline unit on the vessel was central to the entire P&A

contract." *Id.* The court also rejected the argument that the spud barge's role was not substantial because it merely served as a "work platform."[8]

Returning to the case at bar, Clovelly mentions the spud barge only twice in its complaint, giving the impression that the barge played an insignificant role in the flowline cleaning operation. (Clovelly 2d Am. Compl. ¶¶ 23, 25). Contrariwise, the Individual Plaintiffs' complaints—which the Court was required to consider to decide this motion, *see infra* Part C—allege that practically all of the work to clean the flowlines occurred from the spud barge. For example, Billiot's complaint alleges:

> On October 15, 2017, the Corporate Defendants and/or Select [another defendant] mobilized a tug boat and spud barge ("the Barge") in Lake Pontchartrain preparatory to the commencement of their paraffin wax cleaning service on Clovelly's wells. The tug and Barge were required to perform the job because of the location of the Clovelly wells on the navigable waters of Lake Pontchartrain.
>
> Located on the Barge were the Hydra Steam Generator, the PLC [Programmable Logic Controller], the H2O2 [hydrogen peroxide] tanks, the catalyst, and other necessary equipment including the pump and hoses.
>
> The Corporate Defendants, Lime and/or Select commenced on the Barge their paraffin wax cleaning service on the first of Clovelly's wells at approximately 1:30 p.m. on October 15, 2017.
>
> Present on the Barge at the commencement of the operation, and at all relevant times thereafter, were employees and/or representatives of the Corporate Defendants, Select and Lime . . . .

---

[8] *Id.* ("We do not see [the spud barge's] role as being properly demeaned in this way, so long as the vessel is being used for more than transporting between land and the wellsite. Indeed, its necessity as a work platform is particularly relevant. To the extent there was not enough space on the fixed platform for the equipment, such as for the wireline unit, the role of the vessel becomes more significant. Its utility as a work platform comes from its being a vessel, as it could be positioned as needed at the well site, then proceed to the other wells to perform similar functions. According to Carrizo, the [spud barge] was being used every day, certainly as crew quarters but also for its crane, the wireline unit, and other equipment that could not be moved onto a platform.").

> The Hydra Steam Generator was connected to the wellheads by a coflex hose by employees or representatives of Select and/or the Corporate Defendants, and controlled and monitored at all relevant times on the Barge by employees and/or representatives of Select, the Corporate Defendants and/or Lime, or any one of them.
>
> Using the process described above, the Corporate Defendants, Select, and/or Lime successfully cleaned the oil flowlines for State Lease 4041 Well No. 1 Well (Serial No. 133600) and State Lease 4041 Well No. 3 Well (Serial No. 136306), without incident.
>
> During the process and procedures on the Barge to clean paraffin wax on the four-inch flowline attached to State Lease 5568 Well No. 1 (Serial No. 137574), at approximately 7:18 p.m., a catastrophic explosion and fire occurred in and around the Tank [located on the Platform] causing extensive, severe and disabling injuries to Plaintiff, Davin Billiot . . . .

(Billiot Compl. ¶¶ 19-26 (paragraph numbers omitted)). At a hearing on May 22, 2019, Clovelly's counsel made statements that are consistent with the allegations in the Individual Plaintiffs' complaints: "[T]here [were] people in this case who were making this concoction . . . ***on the barge***, and this concoction was being used to clean the lines and put into the lines ***from the barge***." (Rec. Doc. 346 at 22 (emphasis added)). This indicates to the Court that Clovelly's complaint greatly understates the barge's role in the flowline cleaning work.

If the barge's role was as the Individual Plaintiffs allege, then this case would seem nearly indistinguishable from *Crescent Energy*, meaning Clovelly's claims would be governed by substantive maritime law.[9] And if maritime law applies, then it would also appear that Clovelly's veil piercing claims would be governed by federal common law, not Texas or Bermudan law. *See Clipper Wonsild Tankers Holding A/S*

---

[9] The Court notes that on occasions when it is unclear whether or to what extent the parties anticipated vessel involvement, which could be the case when the contract is oral, evidence of the extent of actual vessel involvement may be used to establish this fact. *See Doiron*, 879 F.3d at 577.

*v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 508 (S.D.N.Y. 2012) (holding that federal common law, as opposed to state law, applies to plaintiff's alter ego claim where the dispute arose from a maritime contract, and noting that "even if Plaintiffs had not alleged maritime jurisdiction, the substantive law of admiralty would nonetheless apply."); *see also Port of S. La. v. Tri-Parish Indus., Inc.*, No. 11-3065, 2013 WL 2394859, at *3 (E.D. La. May 28, 2013) (federal common law applied to the alter ego claim because plaintiff's underlying negligence claim was cognizable in admiralty).

Of course, the Court's inquiry under Rule 12(b)(6) is limited to the complaint, documents attached to the complaint, and matters that may be judicially noticed. *See Inclusive Cmtys.' Project Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019). As is evident from the foregoing, the Court has considered materials beyond Clovelly's complaint. For that reason, and because Clovelly and Defendants have not addressed *Crescent Energy*, the application *vel non* of maritime law to Clovelly's claims, and the veil-piercing standard for contract claims under federal common law, the Court will simply deny Defendants' motion insofar as it concerns Clovelly's veil piercing claims against BTB and Global Oil. The parties can re-raise these issues on summary judgment.

## C.    Individual Plaintiffs' Claims Against BTB and Global Oil

The Individual Plaintiffs argue that their claims are maritime torts, therefore their veil piercing claims are governed by federal common law. Defendants contend that Plaintiffs' claims are not maritime torts, and therefore, as summarized above,

11

Texas and Bermudan law supply the veil piercing standards for BTB and Global Oil, respectively.[10]

The test for whether a tort is maritime is different from the contract test discussed above. The Supreme Court has explained:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (citations and quotations omitted).

There appears to be no dispute that the location test is met. The Individual Plaintiffs suffered injuries on the Platform (which is treated as land) that allegedly were caused by a vessel on navigable water. There similarly appears to be no disagreement that the general features of this type of incident—an explosion on a platform located in navigable waters—are potentially disruptive of maritime commerce. The parties' disagreement centers on the second part of the maritime

---

[10] The Court pauses to note that there may be more at stake here than a mere disagreement over which law will apply to the Individual Plaintiffs' veil piercing claims. While Bordelon and Pfister's complaint asserts alternative grounds for federal subject matter jurisdiction—admiralty and diversity (Bordelon/Pfister 2d Am. Compl. ¶ 5)—Billiot's complaint invokes only admiralty (Billiot Compl. ¶ 1). Furthermore, Billiot's complaint is unique in that it names Select Oilfield Services, a non-diverse party, as a defendant. (Billiot Compl. ¶ 2). Thus, if admiralty jurisdiction does not exist over the Individual Plaintiffs' claims, then the Court may lack subject matter jurisdiction over Billiot's complaint.

connection test, *viz.*, how to describe the "general character of the activity giving rise to the incident" and whether this has a "substantial relationship to traditional maritime activity."

Defendants, relying primarily on *In re Louisiana Crawfish Producers*, 772 F.3d 1026 (5th Cir. 2014), describe the activity as "pipeline maintenance/repair" and argue that such activity does not have the requisite connection with traditional maritime activity. This description, however, bears a striking resemblance to descriptions rejected by the Supreme Court in *Grubart*.

In *Grubart*, Great Lakes Dredge and Dock Company ("Great Lakes") used a spud barge to replace wooden pilings clustered around the piers of bridges in the Chicago River. 513 U.S. at 530. A crane on the barge pulled up the existing pilings and then drove new pilings into the riverbed. *Id.* The work allegedly damaged a freight tunnel beneath the river, which eventually caused river water to flow into the tunnel and flood buildings onshore. *Id.* The Supreme Court granted certiorari to determine whether admiralty jurisdiction existed over claims that Great Lake's faulty replacement work caused the inland flood damage. *Id.* at 531. The Court held that admiralty jurisdiction was present. *Id.* at 531, 548.

Regarding the general character of the activity giving rise to the incident, the parties opposing admiralty jurisdiction in *Grubart* argued that the activity should be described as "repair and maintenance" or "pile driving near a bridge," omitting, as Defendants do here, any reference to vessel involvement or that the work occurred on navigable waters. *Id.* at 541. The Court rejected these descriptions as

"hypergeneralization" and explained that the maritime connection test "would merely be frustrated by eliminating the maritime aspect of the tortfeasor's activity from consideration." *Id.* at 542. The Court chose instead to characterize the activity as "repair or maintenance work on a navigable waterway performed from a vessel" and concluded that such activity is substantially related to traditional maritime activity, because "barges and similar vessels have traditionally been engaged in repair work similar to what Great Lakes contracted to perform here." *Id.* at 540. In reaching this conclusion, the Court made explicit that the activity need not be "on all fours with the maritime shipping and commerce that has traditionally made up the business of most maritime courts."[11] *Id.* at 543. Moreover, the Court was not dissuaded by the argument that "[i]f the activity at issue here is considered maritime related, . . . then virtually every activity involving a vessel on navigable waters would be a traditional maritime activity sufficient to invoke maritime jurisdiction," responding:

> [T]his is not fatal criticism. This Court has not proposed any radical alteration of the traditional criteria for invoking admiralty jurisdiction in tort cases, but has simply followed the lead of the lower federal courts in rejecting a location rule so rigid as to extend admiralty to a case involving an airplane, not a vessel, engaged in an activity far removed from anything traditionally maritime.

*Id.* at 542 (quotations omitted). The Court concluded by observing that while the current test for admiralty tort jurisdiction test has added new elements to the traditional locality rule, it still "reflects customary practice in seeing [admiralty] jurisdiction as the norm when the tort originates with a vessel in navigable waters"—

---

[11] Indeed, *Grubart* cited with approval decisions by lower courts that found the following activities within admiralty jurisdiction: bridge repair by a crane-carrying barge, repair of a wave suppressor from a barge, dredging navigable waters, and pile driving from a crane-carrying barge. *Id.* at 540.

as allegedly occurred in this case—"and in treating departure from the locality principle as the exception." *Id.* at 547.

Just as *Grubart* rejected as "hypergeneralization" efforts to describe the activity as "repair and maintenance" without reference to Great Lakes' crane-carrying spud barge, so too will this Court reject Defendants' efforts to describe the activity here as merely "pipeline maintenance/repair." The Individual Plaintiffs allege that all of the equipment necessary to perform the work was located on and controlled from the spud barge on navigable waters, which moved from wellhead to wellhead in order to access and clean each flowline. (*See, e.g.*, Billiot Compl. ¶¶ 19-23). Consequently, the Court concludes that the proper description of the general character of the activity giving rise to the incident is pipeline maintenance from a vessel on navigable waters. So described, this case is difficult to distinguish from *Grubart*. As *Grubart* explained, "substantially related" does not mean that the activity is "on all fours with the maritime shipping and commerce that has traditionally made up the business of most maritime courts." 513 U.S. at 543. The default is that admiralty jurisdiction is present when the tort originates with a vessel in navigable waters; departure from this rule is the exception. *Id.* at 547. Accordingly, the Court finds that the general character of this activity bore a substantial relationship to traditional maritime activity.

Defendants argue that "the allegation that the equipment used during the pipeline cleaning operations was located on a barge that was brought to the location by a tugboat does not transform the Individual Plaintiffs' claims into maritime torts."

(Rec. Doc. 263 at 9). As just explained, the Individual Plaintiffs do not allege that the barge and tugboat merely transported equipment to the worksite; rather, the flowline cleaning operation was conducted from the spud barge. Furthermore, the barge's "utility as a work platform comes from its being a vessel, as it could be positioned as needed at the [first] well site, then proceed to the other wells to perform similar functions." *Crescent Energy Servs.*, 896 F. 3d at 361 (concluding that such work by a spud barge was "substantial" for purposes of the maritime contract test). As *Grubart* instructs, an activity that is non-maritime when considered in isolation (e.g., pile driving in *Grubart* or pipeline cleaning here) typically will be at least "substantially related" to traditional maritime activity when performed from a vessel on navigable waters. Indeed, the en banc Fifth Circuit recently confirmed that drilling for oil and gas is maritime activity when conducted from a vessel on navigable waters, *see Doiron*, 879 F.3d at 575, even though that activity is not maritime when performed from a fixed platform or on land, *see Hufnagel v. Omega Serv. Indus, Inc.*, 182 F.3d 340, 352 (5th Cir. 1999).

Defendants rely primarily on *Crawfish Producers*. There the Fifth Circuit held that "pipeline construction and repair" is not substantially related to traditional maritime activity. 772 F.3d at 1030. Rightfully so, as the defendants in *Crawfish Producers* did not use vessels in the projects in that case. *Id.* at 1028. Therefore, *Crawfish Producers*' application of the maritime connection test is inapposite.

For these reasons, the Court holds that the Individual Plaintiffs have alleged maritime torts. Defendants do not address the veil piercing standard applicable to

maritime torts or whether the Individual Plaintiffs have plausibly alleged claims that meet this standard. Accordingly, the Court will deny the motion insofar as it seeks to dismiss the Individual Plaintiffs' veil piercing claims against BTB and Global Oil.

## CONCLUSION

For the reasons explained above,

IT IS ORDERED that Defendants' Motion to Dismiss (Rec. Doc. 242) is DENIED.

New Orleans, Louisiana, this 17th day of October, 2019.

_____
United States District Judge